Young, J.,
concurring in part and dissenting in part:
Although I concur that the district court used the wrong quantum meruit valuation method, I respectfully disagree with my colleagues’ assessment of damages on appeal. Over my several years as a jurist, I have tried to remain true to a fundamental principle of appellate review: courts of appeal should spend their working hours deciding issues of law and not issues of fact. Only on rare occasions and under the most egregious circumstances (“clearly erroneous,” “manifestly wrong” or “abuse of discretion”) should we disrupt the factual rulings of the district court. It is on even rarer occasions that this court should peruse the record on appeal and redecide issues that are specifically reserved for the trier of fact.
*994 In the instant case, the majority has spurred this dissent by straying from these fundamental concepts and tangling with an animal that is uniquely bred for trial court taming — damages. See Nelson v. Reinhart, 47 Nev. 246, 219 R 554 (1923) (issue of value of services performed by broker is a question uniquely reserved for trier of fact). In an attempt to work justice and arrive at an equitable solution to Fields’ claim for quantum meruit, the majority reweighs the evidence that was before the trial court and concludes that Fields is entitled to a $450,000.00 real estate commission. This is an additur of nearly $350,000.00. My colleagues hold that the percentage-based commission represents the customary practice in the industry and drives the brokerage fee quantum meruit determination.
I respectfully submit that the majority’s application of this calculation method is erroneous. There is a bedrock principle of contract damages restricting Fields’ recovery that is absent from the majority opinion. The litigant can only recover damages that the contract would provide. In the absence of a contract, I contend that Fields can only recover in quantum meruit what the sale of the investment property would have provided. The ultimate sale to Bodysonic for $5,325,000.00, which the district court held was “procured” by Fields, simply would not allow for a percentage-based commission.
If the majority feels compelled to reevaluate issues of fact and establish a commission amount on appeal, I submit that the proper calculation method would be the “net listings” or “flat fee” commission. Fields’ expert testified that this type of commission was customary and common in the industry. This court has even recognized and upheld the net listing commission in the quantum meruit context. See Close v. Redelius, 67 Nev. 158, 215 R2d 659 (1950). Under this type of arrangement, the broker is simply paid a flat fee over and above a prearranged net sales price. In other words, the seller tells the broker, “I must realize a net sale of $5,250,000.00, and any sales price you can obtain over and above this amount is your commission.”
Midwest demanded a net sale of $5,250,000.00. Midwest would not consummate any deal if it could not obtain such an amount. Fields realized this fact, Bodysonic realized this fact, and the district judge realized this fact. There are several purchase offers and an expired listing contract lying in a trash bin in Fields’ office as a result of Midwest’s steadfast demand. Yet after today’s decision, and after Midwest has absorbed the $450,000.00 commission that it must pay Fields, Midwest has obtained a net sale of only $4,875,000.00 ($5,325,000.00 minus $450,000.00). This is $375,000.00 below its demand. Is this *995 equity? Is it fair for Midwest to pay a commission based upon a hypothetical deal that it would never have consummated?
Quantum meruit should not be restrained by such an obdurate shackle as percentage-based commission in every real estate broker fee case. See, e.g., Close, 67 Nev. at 167-68, 215 P.2d at 663 (quantum meruit net sale commission was appropriate even though amount was “slightly more than one-half of the charge usually made by a broker for selling business property”); see also Romanek-Golub & Co. v. Anvan Hotel Corp., 522 N.E.2d 1341 (Ill. App. Ct. 1988) (affirming five percent quantum meruit commission even though testimony indicated that ten percent commission was customary); and Weichert Co. Realtors v. Ryan, 608 A.2d 280 (N.J. 1992) (in remanding for proper determination of brokerage fee, court holds that reasonable value of fee includes, but is not limited to, customary fees for similar transactions). Quantum meruit is an equitable principle that is applied at the hands of the trial judge after considering the respective positions of the parties. The district court understood that Midwest would never have solidified the sales transaction without netting $5,250,000.00. As a result, the district court specifically rejected a percentage-based commission. The amount was too high and repugnant to the negotiations and efforts of the parties. More importantly, the court realized that the percentage-based commission would have given life to a listing agreement between Midwest and Fields that was dead and withered on the vine.[1]
Neglecting the foregoing, the majority spreads their hands across the vineyard, breathes life into the listing agreement, and makes wine for Fields. My colleagues conclude that the “primary source for resolving this issue [quantum meruit] is the original listing agreement between Fields and Midwest.” Yet in their supporting calculations and rationale, they neglect the very fiber of that agreement. Midwest had to have a $5,250,000.00 net sale.
As I have indicated, if the majority feels some compulsion to establish a commission based upon a paper record, the more appropriate method of valuation is the “net sales” approach. This approach is more consistent with the district court’s findings of fact and seems mandated by the months of negotiations throughout which Midwest steadfastly demanded a $5,250,000.00 net sale. If a commission must be determined on appeal, Fields was entitled only to the amount of money Midwest realized over this *996 demand or $75,000.00 (eventual sale price to Bodysonic, $5,325,000.00, minus the net demand of $5,250,000.00). This is a more equitable figure than that generated by the majority and a more accurate reflection of the negotiations that preceded the eventual sale of the investment property. Fields cannot recover anything greater than the sales transaction would provide.
Casting aside any temptation to determine damages on appeal, however, I would remand to the trial court for further proceedings. The district court heard the testimony of the parties, evaluated the witnesses, and contemplated all of the evidence presented at trial. As a result, the district court is in a better position to make the equitable decisions needed to resolve the quantum meruit dilemma presented by this case.
The majority recognizes that both the net sales and percentage-based commissions are customary in the industry. Moreover, we all agree that the district court abused its discretion in assessing damages by neglecting these customary practices. Yet why take that additional step and choose among these two equally acceptable valuation approaches and engage in an application process on appeal? By balancing the equities, I submit that the majority reaches a decision that is contradictory to the facts of this case and the integrity of the district court’s decision. For example, my colleagues state that “[ujnfortunately, in fashioning a transaction through Torosan to Bodysonic without provision for a commission to Fields, Midwest foreclosed the propriety of using Midwest’s net listing requirement as a fair measure of the reasonable value of Fields’ services.” They continue and conclude that “Fields’ position is endowed with a greater measure of equity and principle than that of Midwest.” The majority is suggesting that Midwest was engaged in chicanery and was therefore prohibited from claiming that Fields could only recover a net sales commission. This type of equitable reasoning is contradictory to our conclusion that the district court properly determined that there was insufficient evidence to support Fields’ claims for fraud and fraudulent conveyance. On the one hand, the majority posits that Midwest fashioned a suspect deal through Torosan and therefore equity demands a $350,000.00 additur for Fields. On the other, the majority agrees with the trial court that the deal through Torosan was not suspect for the purposes of evaluating Fields’ fraud-based claims for relief.
This inconsistency aptly illustrates my point that this court is in no position to sift through the record on appeal and make equitable determinations that are best reserved for the trial court. I would remand and allow the district court to assess which party is endowed with the more equitable position and then have the *997 district court determine what type of commission Fields was entitled to — a percentage-based or net sales commission. Both are customary in the industry.
For the foregoing reasons, I respectfully dissent from the portion of the majority opinion that establishes, with no little spirit of innovation, a quantum meruit amount on appeal.

 The original listing agreement binding Fields and Midwest was signed on September 7, 1990. By the agreement’s own terms, it expired two weeks later on September 20, 1990, and more than four months before the property was eventually sold to Bodysonic.